

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| MATTHEW A. GOODHART,<br><br>                                                *Plaintiff,*<br><br>v.<br><br>THE BOARD OF VISITORS OF THE UNIVERSITY<br>OF VIRGINIA ET AL.,<br><br>                                                *Defendants.* | CIVIL ACTION NO. 3:06-CV-00009<br><br><br><br>MEMORANDUM OPINION<br><br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on Defendants' motion to dismiss this §1983 and Virginia state law action pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, the motion will be granted in an order to follow.

### I. BACKGROUND

The facts alleged in the Complaint or that are undisputed are as follows. Plaintiff Matthew Goodhart was born in Georgia in November 1985 and lived there until August, 2004, when he moved to Virginia and enrolled as a freshman undergraduate at the University of Virginia ("UVA"). He alleges that he currently resides in Virginia and moved to Virginia with the intent to remain there indefinitely.

On June 16, 2005, Goodhart submitted an application for in-state tuition.[1] To qualify for

---

[1] For the 2005-2006 academic year, tuition and fees for freshman who qualified for in-state tuition was $7,370, as compared to $24,290 for non-Virginians. *See* http://www.virginia.edu/undergradadmission/prospectus15.html.

in-state tuition, a candidate must demonstrate that he was domiciled in Virginia for at least twelve continuous months immediately preceding the first day of classes. Defendant Andrea Armstrong, Director of UVA's Committee on Virginia Status of University Students (the "Committee"), denied Goodhart's application initially and on reconsideration. By memorandum dated September 7, 2005, Armstrong advised Defendant Barbara Armacost, Chair of the Committee, that Goodhart had graduated from private high school and that his father, Glenn Goodhart, is both a physician and an attorney. Armstrong also stated that his application had been properly denied.

Goodhart appealed Armstrong's decision and requested a hearing before the Committee, which was held on October 25, 2005. By letter dated December 14, 2005, Armacost issued a written decision denying his appeal, allegedly "indicating that [her] decision was based in part upon the aforesaid Armstrong memorandum of September 7, 2006 [sic]." (Compl. ¶23). Goodhart timely appealed to the President of UVA, Defendant John Casteen, which appeal was denied by letter dated January 27, 2006. This action followed.

Goodhart's first claim is that Armstrong, Armacost and Casteen, acting under color of state law, denied him his "rights, privileges, and immunities as a citizen of Virginia" and violated his "clear and well-established Constitutional right to travel" by subjecting his application for in-state tuition to an illegal wealth test, in violation of 42 U.S.C. § 1983. Invoking supplemental jurisdiction under 28 U.S.C. § 1367(a), he also claims that he is entitled to review on the basis of the record as to whether UVA's decision was arbitrary, capricious, or otherwise contrary to law. *See* Virginia Code § 23-7.4:3. Although compensatory and punitive damages, declaratory relief, and attorneys fees and costs were requested in the Complaint, Goodhart later disclaimed any

2

claim to money damages in connection with the sole federal question claim, and represented that he seeks only equitable relief. (Brief in Opp. at 2, 19, 20); (Motion Hearing, 7/13/06, at 31, 46).

## II. DISCUSSION

Defendants advance three independent grounds for dismissal: (1) the Court must decline to exercise its jurisdiction under the principles of *Younger v. Harris*[2] and its progeny; (2) each Defendant is shielded by Eleventh Amendment immunity from the federal claim as a matter of law; (3) Goodhart has failed to state a cognizable constitutional claim.

Because the Court agrees that abstention is required in this case—albeit under the principles of *Burford v. Sun Oil*[3] rather than *Younger*—Defendants' Eleventh Amendment and substantive constitutional law arguments will not be addressed.

### A. Burford *abstention is required in this case*

The Supreme Court has offered the following "distilled" formulation as to when lower courts should abstain under *Burford*:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989)[4] (citing

---

[2] 401 U.S. 37 (1971).

[3] 319 U.S. 315 (1943).

[4] Because Goodhart has disclaimed any request for money damages and stated his intention to amend his Complaint to seek injunctive relief—which he may do as of right under Fed. R. Civ. P. 15 because Defendants have not yet answered—the Court concludes that it is

3

*Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)).

In *Burford*, the Supreme Court held that the district court should have abstained in a diversity action brought by Sun Oil to enjoin enforcement of an order issued by the Texas Railroad Commission ("Commission") that granted permits to Sun Oil's competitor to drill four oil wells in the East Texas oil field. The permit decision had required the Commission to apply Texas' "general regulatory system devised for the conservation of oil and gas." *Burford*, 319 U.S. at 318.

The Court emphasized a number of factors favoring abstention. First, the case involved "basic problems of Texas policy," *id.* at 322, because the conservation of oil and gas resources—the taxation of which provided much of the state's revenue—by the appropriate assignment of drilling rights stood to significantly impact Texas' economy and its ability to provide educational and social services. *Id.* at 320. The regulatory scheme established under Texas law provided "a unified method for the formation of policy and determination of cases by the Commission and by the state courts"; further, state court review of the Commission's decisions was "expeditious and adequate." *Id.* at 333-34. Finally, the Court expressed concern that the intervention of federal courts in oil regulation cases was almost certain to result in "[c]onflicts in the interpretation of state law, dangerous to the success of state policies." *Id.* at 334.[5]

---

sitting in equity.

[5] In a nod to *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), the source of what has become known as the *Pullman* abstention doctrine, the Court also added in a footnote:

> It is particularly desirable to decline to exercise equity jurisdiction when the result is to permit a State court to have an opportunity to determine questions of State lwa [sic] which may prevent the necessity of decision on a constitutional question.

4

The scope of, and rationales behind, *Burford* were somewhat clarified in *Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341 (1951). Southern Railway sued in federal court to enjoin enforcement of an order of the Alabama Public Service Commission refusing to grant it permission to discontinue rail service on unprofitable routes.[6] In holding that the three-judge federal court[7] should have declined jurisdiction, the Court emphasized that (i) the regulation of intrastate rail transportation is primarily a state's concern and the proposed discontinuation of rail service raised questions about public need for the service—a "predominantly local" concern; (ii) a party dissatisfied with a final order of the Commission enjoyed a statutory right of appeal—"concentrated in one circuit"—to the Circuit Court of Montgomery County, which exercised "supervisory" powers, and appeals to which were an integral part of Alabama's unified regulatory scheme; (iii) intervention of a federal court was not necessary to protect federal rights, which, absent a showing to the contrary, would presumably be preserved and protected in state court; and (iv) abstention in such a case would avoid needless friction with Alabama. *Id.* at 345-48.

Analyzing these precedents in *New Orleans Public Service, Inc. v. Council of New Orleans* ("NOPSI"), the Supreme Court noted the following as important considerations in a *Burford* analysis: whether the constitutional challenge is of minimal federal importance,

---

*Id.* at 333 n.29.

[6] Southern Railway asserted diversity and also federal question jurisdiction, claiming that requiring it to operate loss-making routes amounted to confiscation of property in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 343.

[7] Under former 28 U.S.C. § 2281, which was repealed in 1976, only a district court comprised of three judges could issue an injunction restraining enforcement of an order made by an administrative board or commission acting under State statutes. *Id.* at 344 n.4.

5

involving only whether a state commission had properly applied the state's own regulations;[8] the "intricacy" and importance of the state's regulatory scheme; whether the state had created a centralized system of judicial review, which permitted state courts to develop expertise in interpreting the scheme and the industry; the speed and adequacy of state court review; and the likelihood of "[d]elay, misunderstanding of local law, and needless federal conflict with the state policy." *NOPSI*, 491 U.S. at 360; *see also General Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 708-09 (7th Cir. 1991) (enumerating similar *Burford* factors).

In *NOPSI* itself, an electric utility challenged on federal preemption grounds a decision of the Louisiana rate-making authority to reimburse it only partially for costs incurred in connection with a nuclear power plant joint venture. Citing *Burford* and *Younger*, the district court declined to exercise jurisdiction, and the Fifth Circuit affirmed.

Emphasizing that abstention is the exception, not the rule, the Court found that *Burford* had been improperly invoked. Disposition of the utility's federal claim would not involve resolution of distinctively local regulatory facts or policies or prevent uniform treatment of a local problem. *Id.* at 362. Nor did the utility's action involve a state-law claim, a federal claim "'entangled in a skein of state-law,'" or a "claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors." *Id.* at 361-62. In fact, "no inquiry beyond the four corners of the Council's retail rate order" was needed to determine whether it was facially pre-empted. *Id.* at 363.

---

[8] *See also Harper v. Public Service Comm'n of West Virginia*, 396 F.3d 348 (4th Cir. 2005) (holding that district court erred in abstaining under *Burford* in case brought by owner of Ohio solid waste disposal service challenging on federal commerce clause grounds a decision of the West Virginia Public Service Commission requiring it to obtain certificate of convenience and necessity in order to do business in West Virginia, finding that the federal claim involved a vital federal question).

6

Applying the principles of these cases to Goodhart's claim, abstention appears to be the only proper course. A state "has a legitimate interest in protecting and preserving . . . the right of its own *bona fide* residents to attend [its colleges and universities] on a preferential tuition basis." *Vlandis v. Kline*, 412 U.S. 441, 452-53 (1973). Preferential tuition rates serve not just legitimate, but important, state interests. *See Harper v. Public Service Comm'n of West Virginia*, 396 F.3d 348, 352 (4th Cir. 2005). Low in-state tuition rates expand educational opportunities to a broader socio-economic spectrum of Virginia residents, promoting the interest of equality of opportunity. They also draw to Virginia residents who value education for themselves and their children. Further, with so many competing private and public institutions of higher learning in the United States, preferential rates give those with *bona fide* Virginia ties a strong incentive to pursue post-secondary degrees in-state, increasing the likelihood that they will stay in Virginia and contribute their intellectual capital to its economy. In turn, the higher rates for nonresidents cross-subsidize the lower rates, and contribute to the University's fiscal health.[9] The difference in rates ensures a mixture of students that allows UVA to maintain its character as a Virginia institution.[10]

A state's interest in charging preferential rates, which requires it to distinguish between *bona fide* residents and those who have come solely for educational purposes, allow it to

---

[9] Tuition and fees are the single largest source of revenue for the University of Virginia's Academic Division. *See* http://www.virginia.edu/budget/

[10] In evaluating the propriety of abstention, courts should not construe a state's interest narrowly:

> [W]hen we inquire into the substantiality of the State's interest in its proceedings we do not look narrowly to its interest in the outcome of the particular case-which could arguably be offset by a substantial federal interest in the opposite outcome. Rather, what we look to is the importance of the generic proceedings to the State.

*NOPSI*, 491 U.S. at 365.

7

establish "reasonable criteria for in-state status." *Vlandis*, 412 U.S. at 453-54. To this end, Virginia has adopted a unified scheme of statutes and regulations that specify substantive standards and the administrative and appeals process governing in-state tuition eligibility determinations. *See* Va. Code § 23-7.4 *et seq.*; 8 V.A.C. 40-120-10 *et seq.* Virginia law also vests in the State Council of Higher Education the power to issue or revise related regulations from time to time, in order "[t]o ensure the application of uniform criteria in administering ... and determining eligibility for in-state tuition charges." Va. Code § 23-7.4:3(B). A party aggrieved by a final administrative decision "shall have the right to review in the circuit court for the jurisdiction in which the relevant institution is located." Va. Code § 23-7.4:3(A). Thus, for students of UVA's main campus in Charlottesville who have exhausted the administrative appeals process, an appeal of right exists in the Charlottesville Circuit Court.

In this case, Goodhart alleges in separate state and federal claims that in determining his eligibility for in-state tuition, UVA officials acted contrary to state law in weighing an impermissible factor—his father's wealth—against him, and that in so doing, these officials also violated his federal constitutional rights.

Evaluation of Goodhart's claims by this Court would disrupt state efforts to establish a coherent policy with respect to a matter already found to be of substantial local concern. If this Court made the factual finding that UVA officials considered his father's wealth as a factor in evaluating Goodhart's application, the next question would be whether doing so violated Virginia law. This apparent issue of first impression would be decided by a federal court—the decision of which would not be controlling precedent in Virginia state court or binding on UVA policymakers in future cases. In all likelihood, this Court would also have to decide whether any

8

misapplication of Virginia law under the circumstances was harmless error—another novel issue that would not benefit from clarification in a binding state court decision. Virginia's avowed goal of applying uniform criteria to in-state tuition eligibility determinations would thereby be delayed and frustrated. Further, regardless of the outcome of this case, the discovery and fact-finding required would create needless friction in our federal system, as a federal court inquired into the motives of state officials and the process by which their decisions were made.

Other *Burford* factors are relevant in this case. As already noted, Virginia has a statutory and regulatory scheme designed to provide "a unified method for the formation of policy." *See Burford*, 319 U.S. at 333. Within this scheme, an absolute right of appeal of a final administrative decision is "concentrated in one circuit court," which appeal right appears to be "an integral part of the regulatory process." *See Southern Railway*, 341 U.S. at 348. Unlike the important federal questions presented in *NOPSI* and *Harper*, this case involves a vague constitutional challenge "of minimal federal importance, involving solely the question whether [a state] commission . . . properly applied [its own] regulations." *NOPSI*, 491 U.S. at 360. Nothing in the record indicates that state court review would not be "expeditious and adequate." Nor does it show that Goodhart did not have a full and fair opportunity to raise his constitutional claim in UVA's administrative proceedings, or, if he had sought review, in Virginia state courts.[11]

Although thisCcourt recognizes that abstention is the exception, not the rule, the combination in this case of Virginia's stated desire to promote uniform interpretation of a unified

---

[11] In fact, Defendants note that Goodhart presented his constitutional arguments to UVA's Committee on Virginia Status and to Defendant Casteen, thereby preserving them for later review. (D. Reply at 9 n.4).

9

regulatory scheme governing a state matter of substantial public concern, the lack of an important federal interest, the risk of needless federal intrusion into a well-developed state procedural process, and the other factors mentioned above compel this court to abstain from exercising jurisdiction.

### B. *This does not appear to be the type of proceeding to which* Younger *abstention applies*

The *Younger* and *Burford* abstention doctrines are both grounded in concerns about the proper role of federal courts vis-a-vis the states when important state interests are involved. And "[t]he various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases." *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 11 n.9 (1987). However, *Younger* abstention has traditionally been invoked by federal courts declining to interfere state *coercive* proceedings, and thus does not appear to apply in this case:

> Although our concern for comity and federalism has led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions . . . it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.

*NOPSI*, 491 U.S. at 367-68 (omitting citation to *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) (suit to enjoin execution of state court civil enforcement judgment closing theater under Ohio nuisance statute); *Trainor v. Hernandez*, 431 U.S. 434 (1977) (suit seeking to quash writ of attachment and enjoin civil action brought by Illinois Department of Public Aid seeking return of welfare payments allegedly wrongfully received); *Juidice v. Vail*, 430 U.S. 327 (1977) (seeking to enjoin civil contempt order); *Pennzoil*, 481 U.S. at 13 (seeking to enjoin imposition of lien and enforcement of judgment arising out of private civil dispute)).

10

Defendants principally rely on *Moore v. City of Asheville*, 396 F.3d 385, 395 (4th Cir. 2005) in arguing for abstention under *Younger*. *Moore* involved a federal suit seeking to enjoin enforcement of Asheville's noise ordinance. Plaintiff had twice been cited and fined for violating the ordinance. *Id.* at 388-89. Characterizing such enforcement mechanisms as coercive, the Fourth Circuit affirmed the district court's decision to abstain under *Younger-Huffman* even though plaintiff's right to appeal in state court had lapsed by the time the federal suit was brought, because his claim effectively sought reconsideration of the state's coercive proceedings and to cast aspersion on them, or to annul their results. *Id.* at 395.

Although Goodhart also seeks to cast aspersion on a state administrative proceeding and to annul its results, this case lacks the element of coercive state action. Goodhart's voluntary submission to an administrative proceeding, initiated by his application for a tuition benefit, distinguishes this case from those in which *Younger* has been cited as grounds for abstention. It has not been previously suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing noncoercive executive action. *Cf. NOPSI*, 491 U.S. at 368. Whereas *Younger* and its progeny seem to reflect the federalism concerns that arise when a state's coercive powers are challenged in federal court, *Burford* is invoked in cases involving state laws that touch on important state or local interests in which the comparative competence of federal and state courts favors that the latter handle especially complex areas of state law, or in which there exists a particular need for uniform application of state law.

## III. CONCLUSION

For the reasons set forth above, this Court will abstain from exercising jurisdiction, and

11

Defendants' motion to dismiss will be granted in an order to follow.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: _____
U.S. District Judge

July 31, 2006
Date

12